[Crim. No. 824.  Third Appellate District.—February 26, 1925.]

## THE PEOPLE, Respondent, v. SAM VATEK, Appellant.

[1] CRIMINAL LAW—MURDER—VERDICT—EVIDENCE.—In this prosecution for murder, the evidence was sufficient to support the verdict of guilty.

[2] ID.—OWNERSHIP OF PERSONAL PROPERTY — EVIDENCE — MOTIVE.— In a prosecution for the murder of one who was occupying a room in a rooming-house conducted by defendant and his wife, the testimony of a witness, who was in defendant's own room

---

2. Admissibility of evidence of other crimes to show motive for homicide, note, 7 Ann. Cas. 67.

in said rooming-house shortly before the commission of the homicide, that certain articles of personal property, which were found secreted in defendant's room and on defendant's person, belonged to the witness and that he gave said articles to no one or otherwise voluntarily parted with them, was properly admissible, where the theory could be reasonably evolved from the evidence in the case that the defendant stabbed the deceased with a knife when the latter went to the assistance of the witness to prevent the defendant from taking or to protest against defendant's taking the witness' property.

[3] ID.—THEORY UPON WHICH EVIDENCE IS PRESENTED—APPEAL.—In such a prosecution, the appellate court may assume that the theory upon which the case was presented by the people in the trial court is any theory of which the proofs are reasonably susceptible.

[4] ID.—EVIDENCE — UNTENABILITY OF OBJECTION TO QUESTION — IMPEACHMENT.—In such prosecution, a question asked of defendant on cross-examination, whether an officer, in a conversation with the defendant shortly after the homicide, asked the latter "if this is the knife you cut the Hindu with," was not obnoxious to the objection that it assumed something not in evidence—that is, that the question proceeded on the assumption, unauthorized by any evidence, that the defendant stabbed the deceased and so took his life; nor was the question subject to any objection, it being proper for the purpose of impeachment.

[5] ID.—WITNESSES—IMPEACHMENT.—A witness, whether or not he is a party to the action, or whether he be the defendant in a criminal case, may be asked on cross-examination any question as to any material statement he might at some other time have made inconsistent with his "present testimony" for the purpose either of securing an admission from him of the fact which it is the design of the question to elicit or for laying the foundation for his impeachment as to the particular matter to which the question was addressed.

[6] ID. — ATTACK ON CHARACTER OF WITNESS — IMPROPER CROSS-EXAMINATION—ABSENCE OF MISCARRIAGE OF JUSTICE.—In such prosecution, while it was improper for the district attorney, in cross-examining defendant's wife, to ask her if she was practicing prostitution in the rooming-house where the homicide occurred (an objection to the question having been properly sustained, but no assignment of misconduct in asking the question, or request for an admonitory instruction to disregard the question having been made), it cannot be said, in view of the strong case of guilt made against the defendant, that the alleged misconduct of the district attorney in asking the question resulted in a miscarriage of justice.

[7] ID.—IMPROPER QUESTIONS BY DISTRICT ATTORNEY—ASSIGNMENT OF MISCONDUCT—REQUEST FOR ADMONITORY INSTRUCTION—EXCEPTION

TO RULE.—Where a district attorney, in the examination or cross-examination of a witness in a criminal case, asks questions relative to a matter wholly foreign to the issues and which are pregnant with an innuendo against the personal character of the witness or the defendant, the latter must, to preserve his right to have the conduct of the prosecuting officer in asking such questions reviewed on appeal, except to and assign such conduct as misconduct, and also request the court to assign such conduct as misconduct, and also request the court to instruct the jury to disregard the questions and all that they imply. This rule has been departed from in cases where the district attorney, after objections to the questions have been sustained, has persistently pursued the inquiry to which the questions were addressed.

[8] ID.—ALLEGED COMMISSION OF OFFENSE BY THIRD PARTY—PROPER EXCLUSION OF EVIDENCE.—In such prosecution, the trial court was right in excluding and striking out the testimony purporting to show the alleged movements and statements of a third party (who defendant claimed committed the homicide) on the day and evening of the homicide, where there was no showing worthy of being called such which in any measure or degree connected said third party with the crime or the commission thereof.

[9] ID.—INNOCENCE—EVIDENCE.—It is proper for the defendant to show by any legal evidence that another person committed the crime with which he is charged, and that he is innocent of any participation therein. But before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances as tend clearly to point out such other person as the guilty party. Remote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose.

[10] ID.—EVIDENCE—IMPEACHMENT.—In such prosecution, the ruling allowing the sheriff to say that defendant's wife, on the second day after the homicide, stated to him, in the presence of the district attorney, that such third party left her room at a stated time on the day of the homicide was proper, where defendant's wife, when testifying, was asked whether she made such a state-- ment to the sheriff and the district attorney and replied that she did not remember whether she had or not.

(1) 30 C. J., p. 312, n. 42.   (2) 30 C. J., p. 180, n. 39, p. 181, n. 53.   (3) 17 C. J., p. 217, n. 59 New.   (4) 40 Cyc., p. 2518, n. 81. (5) 40 Cyc., p. 2687, n. 93, p. 2690, n. 95, 96, 97.   (6) 16 C. J., p. 892, n. 2, 3, 5; 40 Cyc., p. 2493, n. 37, p. 2496, n. 43.   (7) 16 C. J., p. 560, n. 49; 17 C. J., p. 58, n. 24, p. 180, n. 18, p. 220, n. 3 New, p. 222, n. 31 New, p. 368, n. 5.   (8) 16 C. J., p. 560, n. 50 New.   (9) 16 C. J., p. 560, n. 43.   (10) 40 Cyc., p. 2728, n. 56, 57, p. 2729, n. 62, p. 2730, n. 63.

APPEAL from a judgment of the Superior Court of Yuba County and from an order denying a new trial. Eugene P. McDaniel, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. E. Davies and E. S. Norby for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, a Greek, and his wife, Ethel Vatek, an American, were jointly indicted by the grand jury of Yuba County for the crime of murder. A motion for a separate trial of the accused having been allowed by the court, the defendant, Sam Vatek, was put upon his trial for the crime charged, and the jury returned against him a verdict of guilty of murder of the first degree, and fixed the penalty at imprisonment in the state prison for life. (Pen. Code, sec. 190.)

A motion for a new trial was made by the defendant and denied, and he appeals from the judgment of conviction and the order denying a new trial.

The points urged for a reversal are: Insufficiency of the evidence to support the verdict and alleged errors in rulings involving questions as to the admissibility of certain evidence.

The homicide took place in the early part of the evening of March 31, 1924, in a rooming-house conducted by the defendant and his wife at the southeast corner of Second and D Streets, in the city of Marysville. The party charged to have been slain by the defendant was a Hindu by the name of Arjan Singh Brar, who was of the age approximately of twenty-one years, and said by one of the witnesses (an American) to be a student. Brar was occupying room No. 2 in said rooming-house at the time of the tragedy.

The building in which the homicide occurred consists of three stories, the first or ground floor of which was occupied by one Heisch as a soft-drink saloon and a cigar-store, and the two upper stories used as a rooming-house by the defendant and his wife, as above stated. On the evening of March 31, 1924, between the hours of 7 and 8 o'clock, a noise resembling

that which would ordinarily be produced by the falling on a floor of a human being or an article of heavy weight, a sort of thud, as Heisch expressed it, was heard to proceed from the second story of the building by said Heisch and a night watchman by the name of Dehoff. These men were in the store of Heisch at the time this noise was heard by them. Dehoff said that the noise sounded as though someone had fallen downstairs. No other noise was heard to proceed from the second story for an interval of about fifteen or twenty minutes, when the same parties heard a noise sounding like some persons were "scuffling" or, perhaps, engaged in a fight. Dehoff, from the nature of the noise, suspecting that a general fight was in progress in the second story, immediately telephoned the police station and reported that a disturbance was taking place in said rooming-house. Dehoff then left the store and hurriedly started south on Second Street with the expectation of meeting any police officer who might have been detailed to investigate the matter. Reaching an alley near the postoffice, a few feet south of the rooming-house, he met Police Officer Allen and one Bennett, the first named having been directed to respond to Dehoff's telephone call and to proceed to the rooming-house and ascertain the cause of the noises. About the time Dehoff was proceeding toward the alley he observed a Hindu step out upon the sidewalk from the Second Street entrance to the stairway leading to the second story of the rooming-house. This Hindu, whose name the officers thereafter learned was Dahram Singh, took several steps in the direction of the alley or the postoffice building, and was still walking in that direction when Officer Allen and Bennett came out of the alley and were met by Dehoff. This was a few minutes after 8 o'clock P. M. Immediately Allen, Dehoff, and Bennett together proceeded to the entrance of the second story of the rooming-house, taking with them the Hindu Dahram Singh. Bennett was stationed by Allen at the foot of the stairway and instructed by that officer to allow no one to leave or enter the building until after a full investigation of the disturbance in the second story had been had. Dehoff was the first to reach the second story and was immediately followed by Allen, with Dahram Singh. When Dehoff reached the top of the stairway at the second story, the first thing observed by him was a man—an American

whose name was later learned to be W. H. Ladner—lying, apparently in a state of unconsciousness, on the floor in room No. 6. This room was near the head of the stairway and was occupied by the defendant and his wife. Then he saw the defendant's wife run down the hallway and turn into room 6. She, so Dehoff said, was intoxicated. Immediately thereafter Dehoff saw three Hindus and the defendant come from the direction of room No. 2. The defendant passed Dehoff and entered room No. 6. The Hindus approached Dehoff and said to the latter: "The Greek (referring to the defendant) stuck a Hindu boy in the front room." Dehoff thereupon entered the room and there he saw the deceased, Arjan Singh Brar, lying on the floor, apparently in an unconscious condition. While all this was going on, Officer Allen, having reached the second floor within a moment's time after Dehoff had arrived at said floor, entered room 6, where the defendant and his wife then were and in which, as seen, Ladner was lying on the floor in an unconscious condition. Dehoff, after a limited investigation, discovered that Arjan Singh Brar had been stabbed in the breast. Blood was flowing from the wound and had soaked through the front part of his shirt. Dehoff reported this to Allen. At the same time three Hindus were standing in the hallway near room 6, and one of them, so Dehoff testified, "hollered in to Allen," still in room 6, accusing the defendant of having stabbed the deceased. Dr. Hoffman, of Marysville, was called and shortly after his appearance and a superficial examination of the deceased the young man passed away. It was then about half-past 8 o'clock P. M. An autoptical examination of the body of the deceased, later conducted by Dr. Hoffman, disclosed that the cause of the death of Arjan Singh Brar was "hemorrhage as the result of an incised wound of the heart." Dr. Hoffman gave it as his opinion that a person so wounded would probably not retain consciousness for a longer period than two minutes.

Officer Allen's version of what transpired after he reached the second floor may the better be told as he related it in giving his testimony at the trial, as follows:

"When I arrived at the head of the stairs, room number 6 was on the right, the door was open. I saw a man lying on the floor who later was identified as Mr. Ladner. I

started to go in the door and Mrs. Vatek was just inside of
the door, she grabbed the door and slammed it shut. I
gave it a couple of kicks and kicked it open before she could
get the lock turned, and then I stepped inside of the room.
The defendant Vatek was coming from the corner of the
room where there was a wash basin in the corner, coming
towards me. I asked what the trouble was. Mrs. Vatek,
who seemed to be highly intoxicated, said there wasn't any
trouble, and began—I says, 'What are you trying to keep
me out of here for?' She said, 'There's no trouble, go on
out,' and put her hands on me and began to try to shove
me out of the room, and I shoved her away from me a few
times, and in the meantime there was several of these Hin-
dus, this Hindu wearing a turban, Bishan Singh, he came
right up to the door and he told me there was a man cut,
a Hindu man cut in another room; I told Dehoff to go see.
He came back and told me, yes, there was a Hindu in there
lying on the floor that was cut, so I told him to stay there
while I went and looked at the Hindu. I looked at the
Hindu, tried to talk to him, couldn't get anything out of
him, I was asking him who cut him. I asked Mit Singh
to ask him to tell him to tell me who cut him and what the
trouble was. Mit Singh told me he could speak good Eng-
lish, that Arjan Singh, the man on the floor, was a student.
So I went back and told Officer Dehoff to get a doctor.
He left the building to get the doctor and I had returned
then to room number 6, and Mrs. Vatek attempted to close
the door again to room number 6. I kicked it open again.
At that time, when I entered she put her arms—tried to
put her arms around my neck, she was just in a drunken
condition, trying to get me out of the room, trying to smooth
things over, telling me everything was all right. I pushed
her away from me; in pushing her away she stumbled and
fell over this man Ladner that was still lying on the floor,
and then the defendant Vatek rushed over to me, grabbed
me by the arm and began to say 'This is white woman, you
no strike this white woman, this white woman like you';
then Bishan Singh, he told me, he said 'You look out, this
man has got knife,' pointing towards Vatek, the defendant.
So I struck with the back of my hand; he had hold of my
clothes, my coat; I struck with the back of my hand like
that, struck him on the throat, he staggered back against

the bed, then I grabbed him by both arms and reached in
his inside coat pocket here and pulled a paring-knife—
Q. Who reached in there first, he or you? A. I reached
in there first, when I knocked him against the bed he
staggered back and he reached like this, I was right on top
of him immediately and I reached in the same pocket he
started to reach in first and found this paring-knife. Q. I
will show you a knife and ask you to look at it and ask
you if you can identify it? A. That is the same knife.
Q. That is the same knife that you took out of his inside
coat pocket? A. Yes. . . . I asked Mit Singh and Bishan
Singh who cut this Hindu and they both told me that the
Greek did. Q. Was Vatek present at the time? A. He was
present. Q. Did they point to him? A. They pointed to
him, said this Greek cut him, this was in room six, the
Hindus were just outside the door, but Vatek and myself
were inside the door. Q. Where was Vatek's wife? A. She
was right there, she was present, part of the time she was
on the floor, part of the time she was standing up; I pushed
her down several times, after that, she would get up and
come to me, put her hands on me; after I took the knife
from Vatek, he looked in a highly excited manner, was
glancing around the room and I pulled my revolver around
in front like this, my scabbard, had my coat unbuttoned, I
told him to stay over in that corner and not start anything
or I would drill him. I told him he had killed this Hindu
and I wasn't fooling with a murderer. We remained in about
that position until Officers McAuliffe and Barrett arrived and
I placed my handcuffs on Mrs. Vatek and Officer Barrett
placed his handcuffs on Vatek, the defendant, and these two
officers took the defendants and started off. Q. At the time
that the Hindus told you that Vatek had cut the Hindu
what did Vatek say? A. He didn't say anything, that is
he didn't say yes or no. . . . Q. When you got that knife
out of his pocket did you ask him anything? A. I asked
him what he was doing with that knife in his pocket, and
he said that he used it to cut greens with. Q. Did you ask
him if he had used that knife to cut the Hindu with? A. I
don't recall now whether I asked him that or not. Q. What
was Vatek's condition at that time? A. In what respect?
Q. Intoxicated or sober? A. He was apparently sober but
in a highly excited condition.''

Allen stated that he aroused Ladner from his sleep and asked him a few questions, but that all that he could get from him was, "I'll fight 'em—I can hold my own." Allen said that Ladner's shirt had been "pulled up above his trousers, and he had a money belt on under his shirt that was exposed"; that "his coat was open and there were papers from his inside coat pocket, some were out and looked like they had been pulled out and stuck back again"; that Ladner had blood on his right hand, which "looked like a smear of blood and a little blood on his hair. His hat was lying over in the corner of the room." The officer, on making an examination of the room, found a rain coat smoothly tucked under the mattress of a bed in the room, opera-glasses in the drawer of a dresser under some feminine wearing apparel, a knife on the floor near where Ladner had been lying and a little over four dollars in silver under a rug in the room. He also found under the cover of the dresser a notice addressed to Ladner from a Marysville newspaper, notifying him that his subscription had expired.

Allen testified that all of the Hindus present, with the exception of one Rulla Singh, were sober. Rulla Singh appeared to be much under the influence of intoxicating liquor.

The witness, Mit Singh, testified that he, Bishan Singh, Nadham Singh and Rulla Singh went to the rooming-house in question at about the hour of 3 o'clock P. M. of March 31, 1924, and rented room No. 3, in which there were several beds. They were assigned to said room by the wife of the defendant, Nadham Singh writing the name of each in the register. After registering and being shown their room they left the house and went down upon the streets. About 8 P. M. of said day the witness and Bishan Singh, accompanied by another Hindu, who was met by the first witness on one of the streets of Marysville, returned to the rooming-house. Mit Singh testified that just as he and his companions reached the top of the stairway at the time last mentioned, the defendant's wife partly opened the door of room 2 (occupied by the deceased), looked toward him and the other Hindus and then started out of the door into the hallway and, addressing the Hindus, commanded them to "go back," or "go away," repeating the command several times. The witness, or one of the other Hindus, replied that they "had rooms there and would not go back." She there-

upon hastily passed the Hindus and entered her own room, No. 6. Immediately following the entrance of defendant's wife into room 6, the witness continued, the defendant, holding the deceased about the upper part of his body with his left hand and his right hand extending down and backward, came out of room 2. The witness saw no knife or other weapon in the right hand of defendant. On observing the Hindus in the hallway, the defendant ordered them to "go away," and at about the same instant of time he released his hold on deceased and rushed past the Hindus and, as other witnesses testified, entered his own room. The deceased fell to the floor and Mit Singh and the other Hindus hastened to his side to assist him. The deceased called for water several times, also exclaimed that he had given "his life for the old American" and thereafter lapsed into unconsciousness, from which state he did not recover. Before the young man expired the Hindus carried him into room 3 and placed him on a bed from which he rolled or fell to the floor, where, as seen, he was lying at the time the police officers and Dr. Hoffman arrived at the premises. In room 3, during all the times mentioned, was Rulla Singh, who had in the course of the afternoon become intoxicated and had gone to said room. Rulla was lying on a bed apparently oblivious to his surroundings and the occurrences of which we have spoken.

The testimony of the other Hindus, who were with Mit Singh, was substantially the same as that of the latter in all important particulars. Bishan Singh, though, added that, when Allen and Dehoff appeared at the second floor, he said to the former that Brar had been stabbed, "so look out for this Greek (referring to the defendant) he had a knife." It should be stated that Dahram Singh testified, and he was corroborated in this by two of the other Hindus, that when the serious condition of the deceased was discovered, he was requested to go to the police station and get an interpreter. This accounted for Dahram Singh leaving the rooming-house and being met by the officers on the sidewalk as above explained.

All of the Hindus named testified that there was no fight, altercation, or difficulty of any kind or character by and between them or anyone of them and the defendant or his wife on the thirty-first day of March, 1924.

The defendant, his wife, the four Hindus above named, and Ladner were placed under arrest and taken to the police station. Later the defendant and his wife were removed to the county jail. On examining the person of the defendant a watch and chain which he admitted belonged to Ladner were found in his possession.

W. H. Ladner, an American, and a farmer of Yuba County, and of whom mention is made above, testified that between the hours of 4 and 5 P. M. of March 31, 1924, he went to the rooming-house in question to procure a room; that when he reached the second floor and was still near the last upper step of the stairway, the defendant's wife came into the hallway from her room, and seeing him, asked him "if I ever drank"; that he asked her what kind of liquor she had, to which she replied, "Some good wine." She invited Ladner into her room (No. 6). There were then in the room, so Ladner testified, the defendant and another man. The witness had four drinks. He paid one dollar for the wine. The interval of time between the drinks was from ten to twenty minutes. He remembered nothing that occurred in the room after taking the fourth drink. He stated that he was perfectly sober when he arrived at the rooming-house; that he was accustomed to drinking wine, and that ordinarily four of such glasses of wine as he drank on that occasion would not have the effect of rendering him so intoxicated as to lose his senses. It was later discovered that Ladner had received an injury on the back of his head. There was matted blood in his hair on that part of his head. He testified that he did not know how the injury was caused; that he had not had a fight with anyone that afternoon or evening and did not know that anyone had struck him, if he had been struck. When he first arrived at the premises, he stated, he had on his person about twelve dollars in money. He recalled that he had a five dollar and a two-dollar bill and some silver. He also had a raincoat, a watch and chain, a pocket-knife, a pair of gloves, a pair of spectacles, or, as some of the witnesses called them, "opera-glasses." At the trial he identified the coat, the opera-glasses, the knife, gloves, etc., found in the defendant's room, as described by Officer Allen, as his property. He also identified the watch and chain which had been taken from the person of the defendant as his property. He testified that

he did not give said personal property to anyone and did not know how or by whom they were taken from his possession.

The sheriff of Yuba County, certain police officers, and the district attorney testified that on a number of occasions after his arrest the defendant, referring to the trouble occurring in his house on the evening in question, declared: "I had to do it to protect my wife"; and on one occasion, when he made the declaration just quoted, the sheriff asked him what he did with his knife, but the defendant made no answer and appeared not to be disposed further to discuss or talk about the case.

[1] The above is a sufficient statement of the People's proofs to show that the verdict of the jury is well supported, evidentially. Indeed, it would be difficult to conceive how the jury, if they believed the witnesses testifying for the People, as the verdict implies that they did, could have formed any other conclusion than that at which they arrived. It is true that no knife with blood upon it was found in the defendant's room, or anywhere on the premises, nor did the potato-knife found in his coat pocket have upon it bloodstains; but, while the circumstance of finding in the room of the defendant or upon his person a blood-stained knife would have afforded strong support to the other evidence tending to connect the defendant with the commission of the crime, yet the proof of such circumstance was not, in view of the strong case otherwise made by the People against the accused, indispensable as in proof of the defendant's guilt or as in justification of the verdict arrived at. But there was testimony, as, for instance, the fact that the defendant was seen to rush toward the sink in his room just as Officer Allen entered the apartment, a circumstance from which, in view of the many strong inculpatory circumstances disclosed by the evidence against the accused, the jury might and could well have reasoned that his purpose in going to the sink was to cleanse the "potato-knife" of blood-stains and that he did so, or the jury might have concluded that the knife with which the fatal wound was inflicted had in some way been secreted about the premises or so disposed of as to make it impossible to find or locate it. There is some testimony relating to the condition of the premises which would lend support to that theory. But there is no

call for an analytical examination herein of the testimony to demonstrate that, as before declared, the verdict is amply supplied with evidentiary support. Someone killed Arjan Singh Brar. It is not claimed that the fatal wound was self-inflicted, nor, in view of the character of the evidence presented by the People, could such a claim reasonably be advanced or sustained. There is no testimony that any one of the Hindus present at the time committed the crime. All the proved circumstances appear to point to the guilt of Vatek. Of course, the latter vigorously denied that he was the author of the homicide, and attempted to explain, consistently with the theory of his innocence, the many damaging circumstances which the evidence by the People developed against him. His wife, testifying for him, attempted to support his plea of innocence. An effort was also made to bolster the defendant's plea of not guilty upon the theory that another party, a Greek, known as Pete Kumbus, might have committed the crime. All of these matters, though, were for the jury to consider with all the other evidence and determine what the truth was as to the ultimate issue upon which their judgment was required. But we find it necessary to examine herein the Kumbus theory, not that the effect thereof, from the standpoint from which a court of appeal must view the proofs, has been to introduce a doubt as to the impregnability of the case made by the People, but solely because it bears upon the rulings of the court disallowing certain testimony presented by the defendant, and which, it is contended, involved errors highly prejudicial to the rights of the accused. Before taking up these assignments for consideration we will dispose of several other points arising from rulings admitting certain evidence.

[2] Assignments Nos. 1, 2, 3, 4, 5, and 6 involve exceptions to the rulings of the court in allowing the district attorney, over objections by the defendant, to show by the witness Ladner that the several and various articles of personal property which, with the exception of the watch and chain, which, as seen, were found on the person of the defendant, were found on the evening of the homicide secreted in different places in the room of the defendant, belonged to the witness. The several articles mentioned were shown to Ladner when he was on the witness-stand and he identified them as his property and which he had in his posses-

sion when first he went into the room of the defendant on the invitation of the latter's wife on the afternoon of the day the homicide was committed. Except in so far as it may be extracted from the evidence as a whole, the particular theory · upon which the testimony now under consideration was offered by the People and allowed by the court is not shown by the record. The evidence presented by the People, however, obviously justifies and supports this theory: That, when Ladner entered the room of the defendant the latter conceived the idea of taking from him any money or other personal property he had in his possession; that, to accomplish that purpose he plied Ladner with liquor in which he had placed some sort of narcotic in a sufficient quantity to produce sleep or unconsciousness; that Ladner having, as a result of drinking the liquor, become unconscious or so much so as to render him incapable of appreciating his surroundings or realizing what was going on about him, the defendant proceeded to carry out his scheme to deprive Ladner of whatever personal property he then had in his possession; that the man other than the defendant that Ladner saw in the latter's room when he (Ladner) first entered it was the deceased; that while the defendant was engaged in taking or perhaps had taken from Ladner his personal belongings, the deceased protested against such conduct and thus a fight between the defendant and the deceased was precipitated, resulting finally in the slaying of the deceased by the defendant. Or, a reasonable theory from the evidence is that, after Ladner had gotten under the influence of the liquor, the defendant started to remove from his person whatever money and other personal property were then in his possession; that Ladner was not so far intoxicated as not to be able to realize what defendant was trying to do and that he resisted or attempted to defend himself and his property; that the deceased went to Ladner's assistance and so attempted to prevent his being injured or his property taken from him; that in the skirmish Ladner was knocked or thrown violently to the floor by the defendant, sustaining an injury to the back of his head and by the blow rendered unconscious; that the defendant either incensed at the interference of deceased in the matter or fearful lest he might in the event of his (defendant's) arrest and prosecution on the charge of larceny become a witness for

the People, assaulted the deceased; that the latter thereupon
fled to his own room and was followed by defendant and
that in said room the latter dealt the knife blow that caused
the death of the deceased. The declaration of the deceased,
just before he passed away, that he had given his life ''for
the old American'' is significant and would seem to afford
strong support, when considered with the other evidence,
to the general theory suggested upon either of the hypoth-
eses pointed out. [3] This court may assume that the
theory upon which the case was presented by the People in
the court below is any theory of which the proofs are reason-
ably susceptible. Obviously, the theory suggested is preg-
nant with a motive in the defendant for the commission of
the crime, and the testimony of Ladner that the articles of
personal property found secreted in the room of the de-
fendant and on his person when arrested, that he had said
property in his possession when he entered defendant's room
on the day of the homicide, and that he gave the property
to no one or otherwise voluntarily parted with it, was, of
course, peculiarly material, relevant and important in proof
of the defendant's guilt upon that theory.

[4] Assignment No. 7 is based upon a ruling permitting
the district attorney to propound the following question to
the defendant on cross-examination: ''Did he (Police Officer
Allen) ask you if this is the knife you cut the Hindu
with?'' referring to the ''potato-knife'' found in the coat
pocket of the defendant immediately after he was seen hold-
ing and later letting go his hold of the deceased as de-
scribed. The objection to the question was that it assumed
something, not in evidence—that is, that the question pro-
ceeded on the assumption, unauthorized by any evidence,
that the defendant stabbed the deceased and so took his life.
The objection was not well taken. It will be noted that the
defendant himself was not asked, as a witness, ''if this is
the knife you cut the Hindu with,'' but whether the officer,
in a conversation with the defendant shortly after the homi-
cide, asked the latter ''if this is the knife you cut the Hindu
with.'' Readily it will be seen that the question was not
obnoxious to the particular objection urged against it. Nor
was it subject to any objection. The question was proper
for the purpose of impeachment. [5] The rule is elemen-
tary, and, indeed, expressly declared in our code, that a

witness, whether or not he is a party to the action or whether he be the defendant in a criminal case, may be asked on cross-examination any question as to any material statement he might at some other time have made inconsistent with his "present testimony" for the purpose, either of securing an admission from him of the fact which it is the design of the question to elicit or for laying the foundation for his impeachment as to the particular matter to which the question was addressed. (Code Civ. Proc., sec. 2052.)

[6] The district attorney (assignment No. 8), cross-examining defendant's wife, put this question to her: "Was any prostitution being practiced on the premises?" referring to the rooming-house in which the homicide occurred. The defense objected to the question on the usual grounds. Before the court had time to rule on the objection the district attorney withdrew the question and then asked this question: "Were you practicing prostitution there?" a prompt objection to which was made and as promptly as well as properly sustained. The line of inquiry involved in the question did not constitute a proper mode for the impeachment of the witness, if such was its purpose, and, indeed, was not proper for any purpose. The witness being the wife of the defendant and associated with him in the operation of the rooming-house in which the homicide was committed, the asking of the question, if having any effect at all upon the jury, would be unjustly to militate against the interests of the defendant or wrongfully diminish the force of any defense which he had interposed or was putting before the jury. A prosecuting officer, as often the supreme court and this court have said, should never ask any question which he knows or ought to know could not elicit relevant or competent testimony, but whose only effect would be to degrade the character of a witness in the estimation of the jury. But the defendant here did not assign the fact of the asking of the question as misconduct on the part of the district attorney, nor did he ask the court to admonish the jury to disregard the question and the unsavory imputation which it carried. [7] It has been held that where a district attorney, in the examination or cross-examination of a witness in a criminal case, asks questions relative to a matter wholly foreign to the issues and which are pregnant

with an innuendo against the personal character of the witness or the defendant, the latter must, to preserve his right to have the conduct of the prosecuting officer in asking such questions reviewed on appeal, except to and assign such conduct as misconduct, and also request the court to instruct the jury to disregard the questions and all that they imply. This rule has been departed from in cases where the district attorney, after objections to the questions have been sustained, has persistently pursued the inquiry to which the questions were addressed. Here the prosecuting officer did not pursue the inquiry after the objection to the question was sustained. Furthermore, the presumption is that the jurors were persons of intelligence and that they clearly understood that the action of the court in sustaining the objection by the defendant to the question meant that the subject matter thereof had no true relation to the case and should be by them disregarded in considering whether the accused was or was not guilty, and that they did disregard it. At all events, we cannot say, in view of the strong case of guilt made by the People against the defendant, that the asking of the question could have exercised any baleful influence in bringing about the verdict returned. Certainly, after considering the entire record, this court cannot justly hold that the alleged misconduct of the district attorney in asking the question referred to resulted in a miscarriage of justice. (Const., art. VI, sec. 4½.)

Assignments Nos. 9, 10, 11, 12, 13, 14, 15, and 16, are founded on the rulings disallowing proof in support of the rather vaguely grounded theory, above referred to, that the crime charged against the defendant might have been committed by one Pete Kumbus. As all of these assignments relate to the same general proposition, they may be considered together. To clarify the consideration of said assignments, it will be requisite to state herein briefly the circumstances which the defendant seemed to have conceived afforded a handle for the introduction of or an attempt to introduce a theory which might bring home to Kumbus responsibility for the homicide.

The defendant and his wife testified that in the early morning hours of March 31, 1924, they left Marysville in their automobile for Yuba City, Sutter County, which is

situated south of and just across the Feather River from the
city of Marysville, their object being to gather "some
greens" growing near Yuba City; that, reaching said place
within a few minutes after they had left their home, and
not knowing just where greens could be found, they called
at the residence of an acquaintance in Yuba City, one Paul
Diacoumes, a Greek, and asked him where the greens could
be obtained; that Diacoumes accompanied them to a spot
several blocks from his residence and pointed out where the
greens were growing; that defendant and his wife gathered
a quantity of the greens and thereupon, with Diacoumes,
returned to the latter's home, where they had lunch at the
noon hour and thereafter remained until about 2 P. M.,
when they left in their car, first taking a short ride and
then returning to their home, reaching there about the hour
of 3 P. M. The defendant testified that the Pete Kumbus
mentioned above called at the home of Diacoumes while
they were having their lunch and that he also ate lunch with
them; that he (defendant) was introduced to Kumbus on
that occasion; that Kumbus then stated to him (defendant)
that he (Kumbus) expected to go to work within a few days
as a section-hand for the Western Pacific Railroad Company
at Marysville. The wife of the defendant testified that, while
it was true that she had seen Kumbus at different times on
the streets of Marysville prior to the thirty-first day of
March, she could not recall that she saw him at the house of
Diacoumes in Yuba City on the thirty-first day of March.
Both the defendant and his wife testified that about thirty
minutes after they reached their home from their trip to
Yuba City, Paul Kumbus appeared at their rooming-house;
that Kumbus was invited into the room of defendant and
wife and remained there several hours drinking wine; that
Kumbus was there while Ladner was there. Shortly after
7 o'clock P. M., the defendant, so he testified, left the room-
ing-house and went to a Chinese restaurant to procure a
chicken for dinner, leaving both Kumbus and Ladner in
the room with his wife; that he had previously invited
both Kumbus and Ladner to remain and have dinner with
him and his wife; that he returned about five minutes to 8
o'clock, and that Kumbus was not there, having before his
(defendant's) return left the house; that Ladner was still

there; that, while he was in the kitchen preparing the
dinner, Ladner started to leave and stepped out into the
hall, where there were four or five Hindus "standing
around"; that the Hindus, for some reason, attacked Ladner,
and that his wife excitedly ran into the kitchen and told
him of the attack; that he thereupon ran out into the hall-
way, found that Ladner had been knocked or fallen down
the stairway a few steps and that he began fighting the
Hindus for the purpose of protecting Ladner from further
assault at their hands; that finally the fighting ceased, and
he and his wife then assisted Ladner into their room and
laid him on the floor. In this connection, it may be stated
that the defendant, in explanation of his possession of Lad-
ner's watch and chain, testified that when he assisted Lad-
ner to his feet from the stairway, he saw the watch and
chain lying on one of the steps and that he picked them up
and placed them in his pocket. Mrs. Vatek testified that
Kumbus was still in their room when the defendant re-
turned with the chicken, but left while her husband was
in the kitchen preparing the dinner and prior to the time of
the alleged assault upon Ladner by the Hindus.

No one saw Kumbus leave the rooming-house nor is there
any evidence in the record showing the precise time at which
he did leave. As to the time that he left the room of the
defendant, the testimony of the latter and that of his
wife, as will be observed, do not agree. It is important to
note, however, that their testimony is in accord upon the
significant fact that he left the room before any disturbance
occurred in the house and was not seen by either the de-
fendant or his wife while the alleged fighting was in
progress.

This statement is sufficient to point the reasons moving the
court to disallow the testimony offered for the purpose of
showing the movements and statements of Kumbus.

We now proceed to the consideration of the rulings ex-
cluding the testimony so proposed. As stated above, the
assignments now to be considered all relate to the same
general proposition and the testimony offered for that pur-
pose and excluded by the court may generally be stated as fol-
lows: By Paul Diacoumes: That, having stated that Kumbus
had been stopping at his home, the period of time during

which he had lived there, when he left there and whether
the witness saw Kumbus on the evening of the thirty-first
day of March, 1924, after he (Kumbus) had left the
witness' house earlier in the day.  By one Steve Ontales, sec-
tion foreman for the Western Pacific Railroad Company at
Marysville: Whether Kumbus, on Monday morning, March
31, 1924, applied to said foreman "with reference to obtain-
ing work" and also by the same witness, who testified that
at different times Kumbus worked ·under the witness for
said railroad company, whether he saw Kumbus at his resi-
dence on the evening of March 31st, and if so, as to how
long he (Kumbus) remained there and whether the witness
had seen Kumbus since the evening of the 31st of March,
and whether witness had a conversation with Kumbus on
the occasion just mentioned.  Exception No. 15: The strik-
ing out of the testimony of one Otto after he had testified
that in the evening of the day of the homicide, about 8
o'clock, as he was crossing an alley about 120 feet from the
entrance to the rooming-house of the Vateks, he was run
down by a man who bore the appearance of being a Hindu;
that when witness first noticed this man the latter was
"looking up Second Street toward the entrance of the Vatek
house; that, after striking him (witness), the man proceeded
down the alley as fast as he could until he disappeared from
sight."  Allowing, over objection by defense, Sheriff McCoy
to say, in response to questions by the district attorney, that,
in a conversation with Mrs. Vatek on the second day of
April, 1924, two days succeeding that upon which the
tragedy occurred, she stated that "there was another Greek
there (referring to her room) that afternoon" (March
31st), and further said that "he left there about 4 o'clock."

[8]  The court was clearly right in excluding and strik-
ing out the testimony purporting to show the alleged move-
ments and statements of Kumbus on the day and evening
in question.  There was no showing worthy of being called
such which in any measure or degree connected Kumbus with
the crime or the commission thereof, and, therefore, his
statement to others as to his intentions with respect to apply-
ing for work with the railroad company, that he was offered
work and agreed to accept the same and then abandoned
his purpose to enter upon such work, was hearsay and in-

competent. There was no offer to show that Kumbus had
any acquaintance with the deceased, or knew that he was
rooming at the house of the defendant, or that he was at
said house at the time he (Kumbus) was there on the thirty-
first day of March, or that he ever had any trouble with the
deceased, or any reason or motive for having trouble with or
slaying him. [9] It is true that it is proper for the de-
fendant "to show by any legal evidence that another
person committed the crime with which he is charged, and
that he is innocent of any participation therein. But before
such testimony can be received, there must be such proof
of connection with it, such a train of facts or circumstances,
as tend clearly to point out such other person as the guilty
party. Remote acts, disconnected and outside of the crime
itself, cannot be separately proved for such a purpose."
(8 R. C. L., sec. 178.) It is to be added that there was no
testimony, nor offer to introduce any, that Kumbus, while
at the rooming-house, had trouble with anybody, or that,
immediately after leaving the room of the defendant, there
was any noise indicating that trouble or a fight or an assault
took place in the room of the deceased which was located
near the room of the defendant and within sight thereof.
To the contrary, according to the testimony of the defendant
and his wife, the first and only disturbance which occurred
on the second floor of the house on the day in question or
the evening thereof was that between the Hindus and Lad-
ner and in which the defendant took a hand. There was
no testimony, or even pretense that, assuming that the dis-
turbance or fight described by the defendant and his wife
did actually take place, either the deceased or Kumbus took
part in it or was in the hallway when it occurred. The
proposed testimony of the witness Otto as to seeing a dark-
complexioned person, resembling a Hindu, passing rapidly
down an alley at about the time the disturbance was heard
in the upper story of the house, constituted the most power-
ful of all the circumstances which the defendant proposed
to introduce as tending to show that Kumbus might have
been the slayer of Brar. But if allowed, that testimony,
without assistance from other facts more directly tending
to connect Kumbus with the commission of the crime, could

not have had the effect of supporting the theory that the latter was the author of the crime, or of shaking the force of the People's evidence, both positive and circumstantial, tending to show, and, indeed, if believable (and the jury believed it), clearly enough showing, that the defendant took the life of the deceased.

[10] The ruling allowing Sheriff McCoy to say that Mrs. Vatek, on the second day of April, 1924, stated to the witness, in the presence of the district attorney, that Pete Kumbus left her room at 4 P. M. on the thirty-first day of March was proper. Mrs. Vatek, when testifying, was asked whether she made such a statement to the sheriff and the district attorney on the day named and replied that she did not remember whether she had or not. Thus the proper foundation was laid for the introduction of the sheriff's testimony as in impeachment of Mrs. Vatek regarding the matter to which the said testimony related.

The judgment and the order are affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 27, 1925.

All the Justices concurred.